# PLAINTIFF'S AFFIDAVIT IN SUPPORT OF ACTUAL DAMAGES

UNDER PENALTY OF PERJURY, Plaintiff Bryce Carrasco ("Plaintiff") submits the following statement as evidence supporting a right to relief from emotional distress damages and lost wages damages.

## I. Emotional distress

Soon after reviewing the collection letters from M&T, my first instinct was to check my credit report. When I saw what M&T had reported it felt like an assault on my character. My credit history is a reflection of my trustworthiness, honesty and reliability; when these things are attacked in bad faith, it affects my ability to participate in and enjoy everyday life. The following statements reflect the emotional toll which M&T has caused me to sustain over the past six months.

1. When M&T furnished blatantly false and misrepresentative information to the three major credit reporting agencies, directly causing my credit score to sharply decline, I was beside myself with anxiety and stress, and I immediately started disputing the information M&T had furnished, and the task soon consumed my free time and eventually overtook my ability to focus on my full-time job.

2. The decline in my ability to perform at work had a major impact on my self-esteem and sense of purpose as I spent the days filled with anxiety and stress at what seemed like a hopeless endeavor.

3. I placed over 100 phone calls to M&T all of which were directed to automated messaging systems and it took hours before I could even speak to an actual human being at M&T Bank.

4. I struggled focusing on anything other than my credit reports and this had a detrimental impact on my mental health and peace of mind, and still does to this day.

5. I continue to spend the majority of my time dealing with this egregiously false information which remains on my credit report in my everyday life, and I have not been able to use any form of credit because the interest rates are simply unacceptable.

6. Having been misled the way I was when I opened the account with M&T is extremely demoralizing especially when I tried to make every effort possible to find a solution with M&T which proved utterly ineffective.

7. I made countless attempts to resolve the issues directly with M&T Bank and they could not even offer me a fifteen minute conversation to talk through the disagreement; as a financial professional this was especially troubling as my credit

1

history plays a significant role on my suitability as an advisory for clients and has a significant negative impact on my perceived trustworthiness.

8. Being that credit is central to my profession, M&T's unwillingness to even try to explain their basis for the defamatory information they furnished had a tremendously negative impact on my self esteem and proved detrimental to my ability to focus on my job and thus resulted in my performance declining severely as I was unable to give my full attention to anything other than the false information which was damaging my credit history.

9. The psychological effects stemming from M&T's defamatory credit reporting and lack of remorse has led to recurring and pervasive physical manifestations including migraines, nausea and dizziness.

10. I spent hundreds of hours studying civil procedure and studying FCRA case law since M&T refused to fix the misleading information it had furnished, instead of socializing and spending time with my family.

11. at the major credit reporting agencies and I called each agency multiple times to explain that I was never obligated to make minimum payments and thus the information as it was being reported falsely portrayed the true nature of the credit relationship I had entered into with M&T. I spent countless hours on the phone trying to navigate through all of the various automated telephone operating systems which was incredibly frustrating and I struggled to focus on my job with Oppenheimer and soon I stopped being proactive in my responsibilities and lost interest in active deals I was working on which theretofore I enjoyed immensely and consistently delivered high quality work product as a result of my natural interest in the work I was doing. I read countless documents, account statements, and credit reports trying to figure out what I was missing and why M&T was unwilling to cooperate in reaching an agreement regarding the information they furnished. I wrote numerous emails to M&T explaining the basis of my disputes and I offered to speak over the telephone to do anything I could to aid their investigative process. I did everything I could possibly do to reach a civil resolution with M&T but again and again my efforts were for naught and M&T demonstrated they did not take the matter seriously as they would not even answer my follow-up emails. It is morally deflating to make such an effort to work out our differences just to be ignored and placed on hold every time I call looking to find answers or explanations. I called M&T hundreds of times between December 2020 and March 2021, with over thirty calls to the three reporting agencies all to be met with rejection after rejection in trying to solve my credit reports. When I had a lot of work for my actual job, I spent the remainder of my free time calling M&T and the credit reporting agencies looking for help, documentation or anything

that might help in fixing the false information which M&T had provided. This involved staying up until 4am on multiple occasions as I researched what I could do to fix the reports and everything proved to be unsuccessful. After the countless hours and nights of lost sleep trying to fix things with M&T, I pivoted to researching the law and what I could do through the courts as it was clear M&T was never going to help fix the errors. I submitted four complaints to the CFPB which did absolutely nothing in resolving the issue. The CFPB did not seem to take any interest in what I viewed as being clear violations of the FCRA. The sheer amount of work which I had to do to file this lawsuit was incredible and put me in a position where I was emotionally unstable due to elevated stress and anxiety which led to countless issues with my family because I was in an agitated state of mind due to everything M&T put me through with pure indifference to it all. The anxiety and stress led to sleep deprivation as I became fixated over the matter and I could not enjoy life the way I had before it all. I was no longer an active and engaging coworker which I was before this all occurred. My fellow colleagues would attest that they no longer heard from me as frequently and they probably thought I just lost interest in the work, but in reality it was all because I was dealing with attacks on my reputation by a Fortune 500 company which at all times violating federal law in how they were handling the disputes. M&T boasts on their social media websites about how they are community-oriented and focus on empathy in their relationships with customers, but this could not be more opposite from my experience. I have zero experience in the legal system and I had to spend all my efforts and attention on learning civil procedure and court system in the United States, because I was not willing to give up and just let M&T successfully carry out their attack on my character. On March 22 2021, I had to schedule an emergency appointment with my psychologist because my mother thought that I was at risk of committing suicide. My mom observed the physical manifestations of the distress cause by M&T and those manifestations gave her cause to believe that I was at risk of doing harm to myself. During the appointment, I explained to my psychologist, David W. Goodman, M.D., who is a distinguished mental health expert, and the reason for this unplanned emergency appointment on March 22, 2021 was due to the stress-induced depression which I suffered from as a result of dealing with the lawsuit which I was forced to file, solely because M&T was unwilling to even try to comply with their statutory duties under federal law. I stated to Dr. Goodman during this appointment that the direct cause of my poor mental health was related to my problems with M&T and the immense stress and anxiety which I have suffered from while trying to represent myself in federal court without anyone helping–completely on my own through it all. I was scared, anxious and under severe distress because of the fact that I had to sue a Fortune 500 company, or else I would have to accept that my credit report inaccurately shows information which misrepresents my dealings with M&T so egregiously for the rest of my life.

This conflict with a Fortune 500 company has virtually consumed my life for the past five months. There is no doubt that all of the issues and emotional distress I have suffered from are the direct result of M&T violating the FCRA.

A review of other awards suggests that $60,000 is within the typical range of compensatory damages approved on the basis of emotional distress. *Sloane v. Equifax Information Services*, *LLC*, 510 F.3d 495 (4th Cir. 2007) (remitting emotional damages award of $250,000 to $150,000); *Zamora v. Valley Fed. Sav. & Loan Ass'n of Grand Junction*, 811 F.2d 1368, 1371 (10th Cir.1987) (upholding a jury award of $61,500); *Cortez v. Trans Union, LLC*, 617 F. 3d 688 (3rd Cir. 2010) (affirming emotional damages award of $50,000); *Boris v. Choicepoint Servs., Inc.*, 249 F.Supp.2d 851, 860-61 (W.D.Ky.2003) (remitting a jury award of $197,000 to $100,000, including a $75,000 award for emotional distress); *Anderson v. Conwood Co.*, 34 F.Supp.2d 650, 656 (W.D.Tenn.1999) (remitting a jury award of $2,000,000 to $50,000).

*Robinson v. Equifax Information Services, LLC*, 560 F.3d 235 (4th Cir. 2009) (upholding jury verdict of $200,000 actual damages award for both emotional damages and economic damages).


*Id*. at 505. The court approved a reward of $150,000 based on the repeated errors after plaintiff made multiple attempts to fix the errors on her credit report. While the case in Sloane involved a claim against a CRA, it is relevant to this case because a furnisher is obligated in the same way that a CRA is under the FCRA, and thus their liability can be determined using a similar framework. I believe that $60,000 is conservative when considering the clear disregard for its statutory obligations and duty of care assumed in regard to upholding its statutory obligations under binding case law which it has no excuse for not knowing. Furthermore, I have factual medical records which reflect treatment based on issues stemming from the matters relating to M&T's unlawful conduct. Medical records which are available support my claim and provide a compelling basis for which to grant the requested $60,000 compensatory award. The physical manifestations of my emotional distress as a result of my dealings with M&T necessitate the award which I am claiming, which is based on binding case law and proper supporting evidence through this statement made under oath and penalty of perjury.

II. **Economic Damages**

M&T's unlawful conduct resulted in a significant deterioration in my ability to focus on my full-time job beginning in December 2020 and extending through the course of these proceedings. This time was a critical period of my employment with Oppenheimer as I was approaching the end of my two-year analyst role and thus had the opportunity to be promoted to a third-year analyst if I was performing at a level which made such a promotion warranted. Going into December of 2020, I would argue that I was a top performer among my peers working as an investment banking analyst for Oppenheimer. I had consistently received extremely positive feedback during all of my semi-annual performance reviews and I earned a bonus after my first

full year of $45,000 in August of 2020 which was in addition to my base salary of $70,000 per year. I believe that the bonus figure reflects my overall contribution to the success of my group at Oppenheimer as I had contributed significantly to several marquee transactions and client engagements won during my time as an analyst. I gave everything to my job and it meant the world to me, and I believe any of my coworkers would agree that I performed at an above-average level during the course of my employment. I was constantly willing to go the extra mile to ensure the highest quality work product and transaction outcomes which I was involved in.

Below are excerpts from my performance review of December 2019:

"Has all of the tools necessary to be an excellent analyst, and I am confident he will continue to hone his skills and develop an understanding of the dynamics, processes and procedures we have to complete the work."

"Bryce is a great asset to the Rental Services team and performs well above the level of a first year analyst today."

"Demonstrates an interest in learning and consistently goes above and beyond to meet expectations and client deliverables."

"He is always willing to put in many late nights and weekend hours to complete client projects."

"Bryce is a remarkably intelligent person with a real passion for finance"

----

M&T took this away from me. They stole a job that I genuinely loved and took it away from me because they were unwilling to resolve the problems they created as a result of their indifference to my situation and could not even offer the time of day to hear why I was so frustrated with what they had published about my credit history. I feel like I have been robbed of something I was really good at and it is all because of M&T's criminal conduct and lack of competent management. Writing this just reminds me of why I was so infuriated to the point I had to file a lawsuit in federal court on my own behalf with no law experience. M&T attacked my character and thought they could just get away with it unscathed. They thought wrong. This is personal. I had a job that I was exceptionally good at and M&T utterly robbed me of the ability to pursue a career path which I loved. And then to think they have the audacity to say that they did nothing wrong is the ultimate assault of my integrity and character. I am 24 years old and I will stop at nothing until M&T is pays the price for their criminal conduct which so greatly affected my life and ability to benefit from a career in finance. It is laughable to assume that my credit score does not affect my qualifications for employment at any financial institution. How am I supposed to explain the huge red flag now contained on my credit score and the related detrimental impact on my trustworthiness, which are all the result of M&T simply thinking they did nothing that

warrants revising or for which they do not even have the honesty to admit they made a mistake in reporting in the first place. M&T Bank will pay the price for what they have made me go through and if you think I will be scared away after having gone through all of this you are utterly mistaken. This was an easily correctible issue when I first reached out to M&T and for whatever reason they felt it was not even worth a response or slightest acknowledgement. I am now unemployed, have no access to credit, and am simply unemployable because of my terrible credit history which is all based on false and misleading information furnished by M&T Bank. To put this in dollar terms, I earned $119,166.68 pre-tax in 2020. For 2021, my gross income is $34,871.76. Because of the fact that I now have to deal with prosecuting a federal lawsuit, I will have lost $84,294.92, and that is before taking into account the income which I was on track to earn based on my career path and if I had been promoted to a third year analyst in investment banking, which I am more than qualified for notwithstanding my terrible credit score, which directly makes me less qualified for a similar job at any financial institution. If I am being honest, $100,000 is far below the actual economic harm caused by M&T and the true figure is over $200,000 which I can provide a compelling argument in support of. There is no admissible evidence which would contradict that. I will get on the stand and do everything in my ability to hold M&T accountable for the damage they have done.

Signed by Bryce Carrasco on 6/25/2021.

DECLARATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on 6/25/2021.

  /s/Bryce Carrasco

Notes

*Bach v. First Union Nat. Bank*, 486 F.3d 150 (6th Cir. 2007).

"The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003). In *State Farm*, the Supreme Court outlined three guideposts appropriate for consideration in determining whether a particular punitive damages award exceeds the boundaries of constitutional propriety. First, the court must assess the reprehensibility of the defendant's misconduct, that is, whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id*. Second, a reviewing court should consider the disparity between the actual or potential harm suffered by the plaintiff – the injury covered by any compensatory damages award – and the punitive damages award

---

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003)

We [the Supreme Court] recognized in *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U. S. 424 (2001), that in our judicial system compensatory and punitive damages, although usually awarded at the same time by the same decisionmaker, serve different purposes. *Id*., at 432. Compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *Ibid*. (citing Restatement (Second) of Torts § 903, pp. 453-454 (1979)). ~~By contrast, punitive damages serve a broader function; they are aimed at deterrence and retribution. Cooper Industries, supra, at 432; see also Gore, supra, at 568 ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition"); Pacific Mut. Life Ins. Co. v. Haslip, 499 U. S. 1, 19 (1991) ("[P]unitive damages are imposed for purposes of retribution and deterrence~~"). The reason is that "the elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that may be imposed."

The Supreme Court instructed courts reviewing punitive damages to *consider* three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized

or imposed in comparable cases. It should be presumed that a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.

Reprehensibility Analysis

The same reasons lead us to conclude the Utah Supreme Court's decision cannot be justified on the *grounds that State Farm was a recidivist*. Although "[o]ur holdings that a recidivist may be ==punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance==," Gore, supra, at 577, in the context of ==civil actions courts must ensure the conduct in question replicates the prior transgressions==. *TXO*, 509 U. S., at 462, n. 28 (noting that courts should look to 'the existence and frequency of similar past conduct'(quoting *Haslip*, 499 U. S., at 21-22)).

The plaintiff must show conduct by the defendant similar to that which harmed them, including evidence of repeated misconduct of the sort that injured them. The evidence of other acts need not be identical to have relevance in the calculation of punitive damages, but needs to show similarity so as to not make the prior transgression wholly tangential.

The Campbells have identified scant evidence of repeated misconduct of the sort that injured them. Nor does our review of the Utah courts' decisions convince us that State Farm was only punished for its actions toward the Campbells. Although evidence of other acts need not be identical to have relevance in the calculation of punitive damages, the Utah court erred here because evidence pertaining to claims 424*424 that had nothing to do with a third-party lawsuit was introduced at length. Other evidence concerning reprehensibility was even more tangential. For example, the Utah Supreme Court criticized State Farm's investigation into the personal life of one of its employees and, in a broader approach, the manner in which State Farm's policies corrupted its employees. 65 P. 3d, at 1148, 1150. The Campbells attempt to justify the courts' reliance upon this unrelated testimony on the theory that each dollar of profit made by underpaying a third-party claimant is the same as a dollar made by underpaying a first-party one. Brief for Respondents 45; see also 65 P. 3d, at 1150 ("State Farm's continuing illicit practice created market disadvantages for other honest insurance companies because these practices increased profits. As plaintiffs' expert witnesses established, such wrongfully obtained competitive advantages have the potential to pressure other companies to adopt similar fraudulent tactics, or to force them out of business. Thus, such actions cause distortions throughout the insurance market and ultimately hurt all consumers"). For the reasons already stated, this argument is unconvincing. The reprehensibility guidepost does not permit courts to expand the scope of the case so that a defendant may be punished for any malfeasance, which in this case extended for a 20-year period. In this case, because the Campbells have shown no

conduct by State Farm similar to that which harmed them, the conduct that harmed them is the only conduct relevant to the reprehensibility analysis.

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).